Filed 2/19/26  In re C.D. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re C.D., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>C.D.,<br><br>       Defendant and Appellant. | A173748<br><br>(Contra Costa County<br> Super. Ct. No. J24-00204) |

C.D. (mother) challenges the visitation order entered by the juvenile court when it terminated jurisdiction over her son, C.D. (minor).  Mother contends the juvenile court abused its discretion in ordering that her visits be supervised by a professional monitor at her expense.  We affirm.

### I.  BACKGROUND

#### A. *Juvenile Dependency Petition*

In April 2024, the Contra Costa County Children and Family Services Bureau (Bureau) filed a dependency petition pursuant to Welfare and

1

Institutions Code[1] section 300, subdivision (b)(1), on behalf of minor, then nearly two years old. The petition alleged mother had a chronic mental health condition which placed minor at risk of serious physical harm or injury. Specifically, the petition alleged mother: expressed paranoid ideations that she and minor were being followed and that minor's father[2] and minor's uncle had kidnapped minor; expressed threatening comments and aggressively tried to yank minor out of the uncle's arms; expressed suicidal ideation; exhibited poor judgment in visiting a person she met online, during which the person's mother slapped minor in the face; and had been placed on psychiatric holds at least twice due to psychotic episodes and was inconsistent with her psychiatric medications. Additionally, the petition alleged mother and father had physical altercations in minor's presence and that father had failed to protect minor from mother's conduct.[3]

The Bureau's detention/jurisdiction report recommended that minor remain detained in an out of home placement. In late-March 2024, mother was in the inpatient psychiatry unit and accused father of abusing her. Mother was admitted for bipolar disorder and placed on a section 5150 hold. The social worker interviewed the family on April 8, 2024. Minor was happy and appeared well cared for. He smiled, laughed, and appeared bonded with both parents.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

[3] The petition also alleged father had a chronic substance abuse problem which impacted his ability to provide regular and safe care for minor, but this allegation was subsequently dismissed.

2

Father admitted that he and mother had had at least two physical altercations. The last one occurred in 2023 while he was driving and mother had a psychotic episode. Father reported that mother had been diagnosed with schizophrenia, but he believed she was misdiagnosed. He thought she had postpartum depression and sleep deprivation. Father stated mother was a good mother. He explained she was overly protective but he was not worried about minor in mother's care and did not think she would hurt minor.

Mother reported that father and her brother had kidnapped minor. She also claimed that both father and her brother had physically and sexually abused her, but she refused to provide additional information. She reported she did not have any mental health diagnoses. Maternal grandmother reported she did not know mother's diagnoses but knew she was " 'off and on with her medication.' " The social worker reported that maternal grandmother appeared to have little control or authority over mother.

At the April 2024 detention hearing, the juvenile court ordered minor detained and placed him in the Bureau's care. It awarded visitation to both parents.

## B. Subsequent Review

In May 2024, the Bureau submitted a memorandum to update the court before the jurisdiction hearing. Minor was placed in a resource family approved home and the parents visited separately. During one visit, mother appeared frustrated and had aggressive tones. She became agitated, causing a shift in minor's behavior, who began to hit mother and yank her hair. Mother did not redirect minor and blamed it on him imitating father, who she said " 'beat [her] ass.' " At another visit, mother talked about " 'abusive 'n*ggas' " and having blood and urine running down her leg.

3

Mother reported to the social worker that father had abused her as recently as early-May 2024 and she feared for her life, but she would not provide details. She also accused father of raping her while on her sleeping medication. The Bureau identified concerns regarding mother's untreated mental health issues and her reported domestic violence. At the May 13, 2024 jurisdiction hearing, the juvenile court sustained certain counts of the petition.

The Bureau's disposition report recommended the juvenile court continue out of home placement and offer family reunification services to both parents. During a meeting with the social worker in early-May 2024, mother reported father had stalked her since she was around 17 years old and he would currently "kidnap[] her" by forcing her in the car and taking her places. She repeated her claims of physical violence and sexual abuse by father. She believed she was misdiagnosed with schizophrenia. The social worker advised that mother was a strong advocate for herself and for minor and was determined to ensure minor's needs were met. Father had a demonstrated bond with minor and expressed a desire to enroll in services related to the safety concerns raised by this case. Minor appeared to be thriving and played well. He was bonded with his parents and experienced emotional distress during separation.

Regarding mother's referrals or progress, a psychiatric evaluation was still pending. Mother participated in weekly individual therapy. She had been provided several domestic violence resources and services to enroll in. Father indicated he would enroll in a 52-week domestic violence education program and planned to participate in an alcohol or drug abuse intake assessment.

Regarding visitation, the Bureau's report summarized visits by both parents from April to June 2024. Mother's agitation and inappropriate behavior had already been documented in a prior report. Mother had challenges regulating her emotions and at the end of visits she became dysregulated, causing minor to become dysregulated. Father appeared emotional and was good at redirecting minor's behavior, and he had established a goodbye routine which allowed minor to be relaxed. Mother and father both engaged with minor. Minor often ran to mother and hugged her. Minor seemed happy. The report stated that both parents' care, concern, and love for minor was evident since the case began.

At the June 17, 2024 disposition hearing, the juvenile court found that minor's placement with mother and father would be detrimental and continued out of home placement. The court ordered reunification services for both parents.

In the following months, both parents engaged in services and their interactions improved. They completed parenting education classes and participated in family therapy with minor. Mother participated in individual therapy sessions and was reported to be actively addressing her concerns. Mother also completed a domestic violence program. She began taking her medication in September 2024 and participated in monthly meetings with her psychiatrist for medication management. By November 2024, mother had "stabilized her mental health and [was] actively taking her medication as prescribed." Father participated in individual therapy and in a 52-week domestic violence education program. The improvements led to weekly unsupervised visitation and, in November 2024, the juvenile court granted the parents a 29-day overnight with minor. At the December 2024 family reunification review hearing, the juvenile court returned minor to his

parents' custody with family maintenance services. There were no safety concerns observed or expressed by either parent when the social worker made unannounced visits to the home in December 2024 and January 2025.

Circumstances changed drastically after January 2025, as documented by the Bureau's May 2025 report prepared for the family maintenance review. At the time, father lived in the family's apartment and mother lived with maternal grandmother and minor spent equal time in each parent's separate residence. For the first time, the Bureau summarized events from July 2024 which had not previously been reported. This included mother claiming that both father and members of her family had sex trafficked her. Father denied the allegations.

On February 25, 2025, mother went to a domestic violence shelter with minor. The social worker met with mother and minor at the shelter the next day. Mother alleged: father screamed at minor; father hung minor upside down, although mother did not say if it was during play or discipline; father did not answer the phone when she called; he drove recklessly; father kicked her out of the apartment and forced her to go to grandmother's home; father was " 'drugging' " minor with melatonin gummies; father left minor unsupervised while playing video games, but mother stated she was there; and at the park father was on his phone and mother watched as minor ran towards a stream and crawled under a fence and father did not get to him before minor got wet. One time mother heard minor crying and asked him what was wrong, " 'Did daddy hit you?' " Minor stated, " 'Daddy don't hit me.' " Mother did not remember when this happened or whether minor had bruises. Mother claimed she reported these incidents to her therapist, the family therapist, and her parent partner. The social worker informed mother that none of these three mandated reporters had called in a referral.

When the social worker spoke with father about mother's claims, he replied: He did raise his voice when minor misbehaved; he denied holding minor upside down; sometimes he needed a break and played video games; one day while driving, mother and he argued and he drove faster than mother wanted, but minor was in his car seat and there was no collision; since returning home, minor's sleep schedule had been off so father bought melatonin gummies but he did not give them to minor because mother told him they were for the wrong age; and sometimes he smacked minor on the hand or took away toys when he misbehaved. Father felt blindsided by mother's decision to leave the home due to feeling unsafe because they got along and spent time together on family outings. He was tired of mother's false accusations.

The family therapist reported the last session was intense because the parents had different parenting styles. Mother tried to leave the session and had mistrust with father. The therapist was unable to confirm mother's claims. Mother had reported that she informed Edna White, the domestic violence program advocate, about issues in the relationship. White reported that mother participated sporadically in the support group and that mother admitted she was not taking her medication, explaining it made her sleepy and father did things to her when she was asleep. White was not clear whether this account was true. The parent partner advised that mother had reported the same allegations she made at the shelter and the parent partner believed her. The social worker was unclear why the parent partner did not alert her to the claims.

After the Bureau informed mother that it did not find minor to be at risk and he would be allowed to visit with father, mother sent the social worker recordings without context and a picture of father when he was

younger holding a gun.  Father explained he was gang involved when he was younger but not currently and reported he did not have any guns. Subsequently, mother called father and asked him to pick her up from the shelter.

After an emergency meeting of the family's team in March 2025, a safety plan was implemented: the parents were not to reside in the same home; they would exchange minor at maternal grandmother's home; they could communicate by phone and video chat so the other parent could speak to minor; and they were to confer with the therapist to decide how best to proceed with sessions.  At the time of the May 2025 report, father was enrolled in domestic violence education classes and was an active contributor. He had attended 33 sessions of the 52-session program and reported that the frequency of his arguments with mother had decreased.  Mother reported she was taking her medication.

Mother provided a letter of support from the domestic violence program.  White, the advocate, reported mother had contacted the agency four times since 2024.  Her habit was that she would make an elaborate allegation and when they questioned her for clarity, her allegations were not logical.  In April 2025, White contacted the social worker expressing concern after a conversation with mother where mother advised she planned to flee with minor prior to the next court date.  Mother had stated she was going to Alabama.  The social worker discovered that maternal grandfather lived in Alabama and should be considered a safety concern because mother had previously identified him as someone who trafficked her as a minor.

Minor was healthy and his speech had improved.  He performed physical activities in line with his developmental age.  He had a loving relationship with both of his parents.  He continued to participate in family

therapy.  The parents had different parenting styles which caused confusion in minor understanding his boundaries.

Regarding visitation, prior to the incident of February 25, 2025—when mother went to the domestic violence shelter—there had been no visitation plan in place.  After the incident and now that the parents lived separately, minor was with each parent a few days a week.  At the time, the visitation plan worked.  Father confirmed he planned to move back to New Jersey after this case closed.

In its May 2025 report, the Bureau assessed the circumstances as follows: Mother had been inconsistent with medication management and not transparent.  The social worker questioned whether mother was medication compliant even though members of her support network stated she was taking her medication.  Mother's behavior was concerning.  For example, she stated she felt unsafe with father and left the home, then called father to pick her up.  She was unwilling to share what made her feel unsafe, told service providers father was trying to get a gun and shared an old picture of him with a gun, and identified maternal grandfather as someone who trafficked her as a child yet she wanted to flee with minor to him.  Father was appropriate with minor and met his needs.  Father needed to maintain clear boundaries with mother and understand that unless mother's mental health was being treated, she was a safety concern to herself, him, and minor.

The Bureau recommended that minor remain in the care of both parents, separately.  At the May 19, 2025 family maintenance review hearing, the juvenile court ordered the Bureau to file a supplemental petition.  The court ordered father to care for minor until detention was addressed and father was not to allow mother access to minor.  Minor was not to leave the courthouse with mother.

9

## C. Supplemental Petition

On May 20, 2025, the Bureau filed a supplemental petition pursuant to section 387. The petition alleged mother's mental health continued to jeopardize minor's safety and well-being. The next day, the Bureau filed a memorandum recommending that minor be detained from mother and placed with father. On May 16, 2025—three days before the recent hearing—mother and minor were at a domestic violence shelter and mother planned to seek a restraining order. After the May 19, 2025 court hearing, the social worker and father spent 15 minutes looking for minor, mother, and maternal grandmother. Father remained in the parking lot while the social worker went to update the court. When the social worker returned outside, father, minor, mother, and maternal grandmother were there. Mother was yelling at father then she yelled at the social worker. Mother screamed that she had bruises all over her body.

The social worker spoke with father on May 19, 2025. He did not know mother had been to a shelter even though they had been together a couple days later. He was blindsided by mother's domestic violence allegations. Father denied being physical with mother since the incident when the case first opened. He wanted to keep minor safe. On the evening of May 19, mother showed up at father's home and beat on his front door asking to see minor. Father contacted the police department twice but apparently mother had left before the police arrived.

At the May 21, 2025 detention hearing on the supplemental petition, the juvenile court appointed a guardian ad litem for mother and mother denied the allegations. The court found a substantial danger to minor's physical and emotional health and detained minor from mother based on her ongoing mental health struggles. The court ordered supervised visitation to

10

mother for a minimum of two hours, two times per week to be supervised by the Bureau or its professional designee. The court also barred mother from going on father's premises and attempting to contact minor. The jurisdiction and disposition hearing was set for July 7, 2025.

### D. Hearing on Mother's Visitation

On June 30, 2025, at the Bureau's request, the juvenile court held a hearing to address mother's visitation. The Bureau explained that mother refused to work with it. The Bureau discovered that mother used services for trafficked victims to obtain a flight and she had ended up in Maryland. While there, she was put on a section 5150 hold. At some point she was released from the hospital and returned to California and was now demanding visitation with minor. Mother called the Bureau while a police officer was with her, thinking the police could enforce visitation. The Bureau wanted to speak with mother and assess her for safety before it would proceed with visitation. Mother had rescinded her releases of information so the Bureau was unable to speak with her psychiatrist or therapist. Accordingly, the Bureau did not know how mother was doing. The Bureau asked the court to suspend visitation, to which minor's counsel agreed. Counsel acknowledged that minor was "very close to his mom and visitations are important," so counsel hoped mother could obtain help and take her medication to safely resume visits.

The juvenile court issued a temporary order in place until the hearing the following week: Mother needed to cooperate with the Bureau and submit proof that she was actively engaged in mental health treatment and was taking her medication as prescribed. She had to provide the Bureau access to that information. If the Bureau deemed her stable, then the court would continue supervised visits. If mother did not provide the required proof and

11

did not meet with the Bureau, then the court would suspend visitation. The court found that visitation during a time when mother had not demonstrated her compliance with mental health treatment would be detrimental to minor.

### E. Termination of Jurisdiction and Exit Orders

The Bureau submitted a memorandum to update the court before the July 7, 2025 disposition hearing. The social worker had received the following contacts from mother: On June 9, mother confirmed she was in Maryland. She explained she had been transported there " 'by several people' " to a home owned by father's family. She also reported she had been given a flight by a domestic violence program. Mother stated she was at Adventist Hospital. On June 11, the social worker received an assessed out referral stating mother reported she had escaped father. She disclosed sex trafficking and said she was sold to father for an arranged marriage when she was 17 years old. There were concerns her information was vague and unclear and it was believed she may have been mentally unstable. On June 12, the social worker received a call from an employee at University of Maryland Capital Regent Health who explained mother had been placed on a psychiatric hold the day before. She arrived at the hospital stating she was the victim of human trafficking and she was believed to be having an acute episode of schizophrenia. The employee expressed concerns regarding minor's whereabouts. With her, mother had a brown paper bag containing at least two cups of minor's hair and a suitcase with his clothes, crayons, toys, and diapers.

On June 14, mother left a voicemail for the social worker stating she had been poisoned by carbon monoxide and had been raped. On June 16, mother left another voicemail stating she was being released from the hospital soon and would make her way back to California to see minor. That

12

same day, mother spoke with the social worker inquiring whether she could still have visits with minor. Mother repeated that she had been hospitalized due to carbon monoxide poisoning. When the social worker inquired whether she was on a psychiatric hold, mother did not answer. On a call the following day, mother stated she was going to another facility and would return to California once released. When the social worker asked multiple times if she was on a psychiatric hold, mother would not answer.

On June 23, mother inquired about visitation and the social worker explained that mother had left the state for two weeks and needed to submit a new visitation form because she was requesting visits be moved to Richmond. On June 25, mother informed the social worker she was with the police to help enforce the visitation order. The social worker explained that law enforcement could not enforce the order because the Bureau designated the visits and who supervised them. In an email to the social worker the next day, mother explained she had made consistent trips to the emergency room for physical injuries and sexual assault.

On July 1, the social worker met with mother to assess her for safety after the juvenile court paused visits. The social worker attempted to have mother sign a release so she could contact mother's psychiatrist, but mother did not sign the form. The following day, mother sent a picture of the signed release form. While the form the social worker had provided checked boxes for the exchange of information for psychiatric/psychological evaluations and therapist/counseling reports, mother had crossed out those items and wrote in that she authorized the exchange of information regarding coordination of care/medication. Mother requested to be present for those conversations. The social worker advised the court that she was not able to assess mother for safety.

As to father, the Bureau advised that father had no concerns regarding minor. Father confirmed that outside of a supervised video call on June 27, mother had not had contact with minor. He confirmed his plan was to return to the East Coast where he would have his family's support.

The report explained that in the prior four weeks, mother had provided the social worker with vague details regarding the causes of her hospitalizations. She continued to make allegations of sex trafficking and sexual assaults but could not provide any evidence or answer follow up questions. Overall, the Bureau recommended that the juvenile court sustain the supplemental petition, terminate family reunification services to mother, have minor remain in father's care, and discharge the matter.

At the July 7, 2025 disposition hearing, the Bureau requested the juvenile court give physical and legal custody to father. Minor's counsel and father agreed and mother objected. The court awarded sole physical and legal custody to father.

As to visitation, the Bureau requested supervised visitation to mother when she was local in the area where father and minor resided, with a professional supervisor to be paid for by mother. Mother's counsel objected, explaining mother "won't be able to afford a professional supervisor" so it was "tantamount to denying her any kind of visitation with her son." While the Bureau was open to a supervisor from father's family, other than father himself, if someone could handle visitation, father opposed the option. While he was planning to move back to the East Coast and had family to do it there, he explained he had no family here. Minor's counsel agreed to the current visitation order and was open to visitation with a member of father's family when they moved to the East Coast. The juvenile court ordered visitation to mother with a minimum of two hours of visits each month to be supervised by

14

a professional supervisor, the cost to be paid for by mother. The visits were to occur in whatever community minor resided in. The court allowed mother to have phone visitation monitored by father.

As to visitation supervised by a family member, the juvenile court explained mother "is extraordinarily unstable at the time and poses a very significant and real risk to the safety and well-being of [minor], and historically father has had a hard time protecting [minor] from that, and, in fact, that's what led to the dependency in the first instance." The court also explained mother had "shown herself capable of absconding with the child and has at times led what appears to the [c]ourt to be a rather nomadic lifestyle with the child in tow, which is extraordinarily risky to the safety and well-being of a child, especially [minor] who is soon to be school age and cannot be tracing around communities from shelter to shelter, across state lines, living in that fashion with a mother who seems disconnected from reality." Therefore, the court stated, it was not "appropriate to allow a family member to supervise the visits as [the court did] not believe a family member could keep [minor] safe under the current circumstances."

The juvenile court dismissed the dependency petition and terminated its jurisdiction over minor. The court's written exit order stated, "Supervised visitation for the mother with the child when the mother is local to the father. Visits must be supervised by a professional supervisor to be paid for by [m]other. Father is not to supervise visits. Mother has long standing and untreated mental health issues that pose a substantial risk to the child."

## II. DISCUSSION

Mother challenges the condition of the juvenile court's exit order requiring visits to be supervised by a professional monitor at her expense.[4]

### A. *Legal Principles and Standard of Review*

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. (§§ 364, subd. (c), 362.4; . . . .) Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122–1123.) A juvenile court "has broad discretion" in fashioning exit orders. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) In doing so, " 'the court's focus and primary consideration must always be the best interests of the child.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513; see also *In re John W.* (1996) 41 Cal.App.4th 961, 974 [court must use "strict best interest standard"].) In ascertaining those interests, the court " 'must look to the totality of a child's circumstances when making decisions regarding the child.' " (*In re J.T.* (2014) 228 Cal.App.4th 953, 963.) Our Supreme Court has explained that there are situations where a court may determine dependency jurisdiction is no longer necessary "and at the same time conclude that conditions on visitation are necessary to minimize, if not eliminate, the danger that visits might subject the minor to the same risk of physical abuse or emotional harm that previously led to the dependency adjudication." (*In re Chantal S.* (1996) 13 Cal.4th 196, 204 (*Chantal S.*).)

---

[4] While mother includes statements regarding the portion of the order requiring that visits be a minimum of two hours per month, a review of her opening brief demonstrates that she only challenges the paid professional supervisor requirement.

We review a juvenile court's exit orders for abuse of discretion. (*In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.) Thus, we will not disturb the order unless it constitutes " ' " ' "an arbitrary, capricious, or patently absurd determination." ' " ' " (*Ibid.*) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

### B. Analysis

Mother does not challenge the requirement that her visits must be supervised. She challenges only the portion of the juvenile court's exit order requiring that such supervision must be by a professional monitor at her expense. We conclude that the court did not abuse its discretion in imposing this condition on mother's visitation.

We acknowledge that the record demonstrates that mother loves and cares for minor and that minor is bonded with her. The juvenile court sustained allegations in the initial dependency petition that mother's mental health condition placed minor at risk. From September 2024 to January 2025, mother had made progress in treating her mental health issues, taking her medication, and engaging in services. But the record highlights major concerns raised by mother's actions which posed a substantial risk of harm to minor beginning in February 2025 through the July 2025 disposition. In February 2025, mother took minor to a domestic violence shelter and made accusations against father which were not confirmed. Despite these accusations, mother then called father to pick her up from the shelter. In June 2025, she obtained a flight from a domestic violence program and ended up in Maryland. There, she reported she was at a hospital and, a couple days

later at a different hospital, she was placed on a psychiatric hold for an acute schizophrenic episode and had minor's hair and belongings with her. She subsequently provided the social worker only vague details of the cause of her hospitalizations and claimed she had carbon monoxide poisoning and had been raped. Mother expressed an intent to abscond with minor to Alabama where her father lived despite having alleged her father trafficked her when she was younger. Immediately preceding the disposition hearing, mother continued to make allegations of sex trafficking and sexual assaults but could not provide any evidence or answer follow up questions. She did not provide proof mandated by the juvenile court that she was actively engaged in mental health treatment and taking her medications as prescribed. Mother herself concedes that "the reports immediately preceding and following the section 387 [supplemental] petition provide support for a finding that the previous disposition was no longer effective in protecting [minor]."

The juvenile court considered whether mother's visits could be supervised by a non-professional and rejected that option. Mother's failure to treat her mental health issues and take her medications were the court's primary concerns. The court explained that mother was unstable and posed a risk to minor's safety and well-being, and it determined that a family member could not keep minor safe under the circumstances. Mother's failure to engage in mental health treatment and actions described above support the court's determination that visits must be supervised by a professional, as there is no demonstration that a non-professional could adequately monitor mother's circumstances and behavior to preclude any risk of harm to minor.

Moreover, mother never identified a potential non-professional monitor. At the time the juvenile court made its decision, both parents and minor resided in the Bay Area. No party suggested that a member of mother's

18

family, or anyone else in the area, could serve as a monitor. And father's family is on the East Coast. The record contains no evidence that mother was able or willing to find someone to serve as a monitor.

Mother asserts she cannot afford to pay a professional monitor, which would result in losing contact and a relationship with minor. Preliminarily, mother cites nothing in the record regarding her ability to bear the expense of a monitor. In mother's opening brief, appellate counsel merely states that "mother is an indigent party of limited means – hence, the representation by appointed counsel on appeal." In any event, mother objected on this ground at the disposition hearing. The juvenile court was entitled to weigh that consideration against the concurrent concerns raised by mother's recent behavior and the inability to assess whether mother was engaging in mental health treatment and taking her medications. (See *In re T.M.* (2016) 4 Cal.App.5th 1214, 1220 [" 'the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense' "].) The court determined that a professional monitor, rather than an unpaid non-professional, was in minor's best interest. Its decision is supported by the behavior and concerns set forth above. (See *Chantal S.*, *supra*, 13 Cal.4th at p. 204 [court may impose conditions on visitation necessary to minimize or eliminate the danger that visits might subject the minor to the same risk of harm which led to the dependency adjudication].) The question on appeal is not whether evidence could support a different order—it is whether the court abused its discretion in issuing the order it did. (See *In re N.M.*, *supra*, 88 Cal.App.5th at p. 1094.)

Finally, mother contends that the visitation order contradicts a policy enunciated under the Family Code—that children should have frequent and continuing contact with both parents after a marriage or relationship ends.

19

(Fam. Code, § 3020, subd. (b).)[5]  Mother's reliance on family law principles is misplaced.  Juvenile courts and family courts have separate purposes. (*Chantal S.*, *supra*, 13 Cal.4th at p. 201.)  While "both courts focus on the best interests of the child, '[t]he presumption of parental fitness that underlies custody law in the family court . . . does not apply to dependency cases' decided in the juvenile court." (*Ibid.*)  The juvenile court here properly focused on minor's best interests.

In sum, the juvenile court's determination that visits must be supervised by a professional monitor at mother's expense was not arbitrary, capricious, or patently absurd.  Accordingly, the exit order imposing conditions on mother's visitation was not an abuse of the juvenile court's discretion.  Mother remains free to seek modification of the order in the family court.  (See §§ 302, subd. (d), 362.4.)

### III.   DISPOSITION

The juvenile court's July 7, 2025 order is affirmed.

---

[5] We observe that Family Code section 3020, subdivision (a), states in pertinent part, "The Legislature finds and declares that it is the public policy of this state to ensure that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding . . . visitation."

_____
LANGHORNE WILSON, J.

WE CONCUR:


_____
HUMES, P. J.


_____
BANKE, J.




*In re C.D. / A173748*